# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**JERFFREY L. SANFORD**
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANGELA N. SANCHEZ**
Deputy Attorney General
Indianapolis, Indiana

FILED

Apr 10 2013, 8:30 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| VALENTIN ESCOBEDO, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 71A03-1202-CR-60 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable Jane Woodward Miller, Judge
Cause No. 71D01-0812-FA-49

**April 10, 2013**

**OPINION – FOR PUBLICATION**

**PYLE, Judge**

Valentin Escobedo ("Escobedo") appeals his convictions and sentence, following a jury trial, for Class A felony battery[1] and Class D felony neglect of a dependent.[2]

We affirm.

## ISSUES

1.    Whether the trial court abused its discretion in its decisions regarding admission and exclusion of certain evidence.

2.    Whether Escobedo's sentence is inappropriate pursuant to Indiana Appellate Rule 7(B).

## FACTS

Escobedo and his wife, Kristina Byers-Escobedo ("Kristina"), had two children: a son, O.E., who was born in August 2003; and a daughter, M.E., who was born in July 2006.  While Kristina worked full-time, the children were watched by either Escobedo, who worked part-time, or by a babysitter, Lisa Rupert ("the babysitter").

In December 2006, Escobedo, who was watching five-month-old M.E., called Kristina and told her that M.E.'s elbow was swollen.  Escobedo told her that M.E. had been in her swing when he heard her cry out and then saw three-year-old O.E. run from the swing.  The following day, Kristina took M.E. to the doctor, where the doctor set M.E.'s elbow and put it in a sling.

In January 2007, M.E. was admitted to the hospital for a respiratory problem.  At that same time, her elbow continued to be swollen.  An x-ray taken of M.E.'s elbow

---

[1] Ind. Code § 35-42-2-1(a)(5).

[2] I.C. § 35-46-1-4.

revealed that she had a fractured elbow. While at the hospital, orthopedist, Dr. Robert Clemency, Jr. ("Dr. Clemency"), also performed a skeletal survey of M.E. and found that she also had prior fractures of her left clavicle and her 8th rib that were estimated to be approximately two weeks old. Given M.E.'s young age and the "constellation of [her] injuries" that did not seem accidental, Dr. Clemency suspected child abuse and contacted Child Protective Services, which is part of the Department of Child Services ("DCS"). (Vol. VII Tr. 41).[3] DCS then removed M.E. from the home and placed her with her maternal grandmother.[4]

In July 2007, DCS returned M.E. to Kristina on the condition that Escobedo not live in the house. Escobedo was, however, able to have visitation with M.E. In September 2007, when Escobedo was visiting M.E., Kristina and Escobedo noticed that M.E. had some sort of problem with her tongue. When they took M.E. to the hospital, Escobedo told hospital staff that his address was the same as Kristina's address. Thereafter, DCS removed M.E. from Kristina a second time and again placed M.E. with her maternal grandmother. DCS returned M.E. to Kristina and Escobedo in December 2007.

In 2008, M.E. sustained various injuries while under Escobedo's care. For example, in June 2008, Escobedo called Kristina while she was at work and told her that

---

[3] The record before us includes a twelve-volume transcript, two volumes of which are separately paginated and labeled as "Addendum." We will refer to the Addendum containing the October 13, 2011 pretrial hearing as "A-1 Tr." and will refer to the Addendum containing the October 24, 2011 hearing on the morning of the jury trial as "A-2 Tr." The remaining ten volumes are also separately paginated. Thus, we will refer to the specific volume number when citing to these volumes of the transcript (e.g., "Vol. I Tr.", "Vol. II Tr.", "Vol. III Tr.", etc.).

[4] DCS did not remove O.E. from the home.

M.E. had fallen out of her crib and had hurt her arm. When Kristina got home, she saw that M.E.'s arm was swollen, and she was not using it. Kristina and Escobedo did not immediately seek medical treatment, but a couple of days later, they took M.E. to have her arm checked at the Hancock Regional Hospital emergency room in Greenfield, Indiana, which is approximately a three-hour drive from their home in South Bend. X-rays taken at the hospital did not reveal a fracture, and the emergency room doctor diagnosed her as having a dislocated elbow or nursemaid's elbow.

In the Fall of 2008, M.E. injured her leg while in Escobedo's care. Escobedo told Kristina that M.E. had gotten her leg caught in the rail of the crib. The injury caused M.E. to walk with a limp and to favor one leg. When M.E. was with the babysitter, she was not able to bear weight on her injured leg. Escobedo and Kristina did not seek medical treatment for M.E.'s limp "because it seemed to go away." (Vol. I Tr. 72).

In October 2008, Escobedo called Kristina at work and told her that M.E. had fallen on the carpeted floor in the hallway and had gotten a black eye. When Kristina returned from work, she saw that M.E.'s eye was a little swollen and that she had a bruise under her eye.

On December 2, 2008, around 7:00 p.m., Kristina left the house to go workout and then to a movie with some friends. Escobedo stayed at home with five-year-old O.E. and two-year-old M.E. When Kristina left the house, M.E. was watching television with O.E. Escobedo made dinner for the children and put them to bed around 9:30 p.m. Kristina called Escobedo around 10:30 p.m. and told him that she was on her way home and that

4

she would pick up some food for him from a fast food restaurant. She asked about the children, and Escobedo said they were asleep.

After getting the food, Kristina returned home and was sitting in her car in the driveway when she received a phone call from Escobedo. Escobedo told Kristina that she needed to come inside the house because M.E. had vomited and he needed help cleaning her. When Kristina went into the house, Escobedo was on the sofa holding M.E., who was wrapped in a blanket and wearing only a diaper. Kristina went to check on M.E. and noticed that M.E. had some scrapes on her cheek and chin that had not been there before Kristina went to the movies. Kristina stroked M.E.'s hair and felt that it was a "little stiff" and a "little wet." (Vol. I Tr. 39). When Kristina stroked the side of M.E.'s face, she noticed that M.E.'s face was swollen and that M.E. was not responding. When Kristina asked what had happened, Escobedo lied to Kristina and told her that he did not know and that he "found [M.E.] like that." (Vol. V Tr. 33). Escobedo told Kristina that he had heard M.E. vomit, "found her in her crib[,]" and then cleaned her up. (Vol. I Tr. 40). Upon seeing that M.E. had her eyes "half open[,]" was not moving, and remained unresponsive, Kristina told Escobedo that they needed to take M.E. to the hospital. (Vol. I Tr. 41).

Kristina and Escobedo drove O.E. to Escobedo's parents' house and then took M.E. to the emergency room at St. Joseph Regional Medical Center, where they arrived around 11:30 p.m. When they arrived at the hospital, M.E. was unconscious, unresponsive, and her right temporal area was swollen. Kristina told medical personnel

5

that she and Escobedo found M.E. unconscious in her crib and that they needed someone to examine her.

Upon examining M.E., the emergency room doctor, Dr. Kurtis Dejong ("Dr. Dejong"), saw that M.E. was in "critical condition" and had a "large amount of swelling" to her right temporal parietal area. (Vol. II Tr. 163, 164). Dr. Dejong performed a CAT scan, which revealed that M.E. had a skull fracture—which measured fourteen centimeters in length—on the right side of her head and a subdural hematoma.[5] Dr. Dejong intubated M.E. and contacted a neurosurgeon at Memorial Hospital, which had a pediatric intensive care unit ("PICU").

After M.E. was transferred to Memorial Hospital, a neurosurgeon, Dr. Stephen Smith ("Dr. Smith"), performed emergency surgery on M.E. to remove some of the blood built up from the subdural hematoma. Dr. Smith also removed a portion of M.E.'s skull to accommodate the brain swelling.

After surgery, M.E. was placed on a breathing machine and transferred to the PICU. While she was in the PICU, doctors performed additional CAT scans and x-rays of M.E. The tests revealed that M.E. had multiple old rib fractures, old fractures of the distal portion of both humerus bones in her arms, as well as an old fracture of her left tibia bone in her leg. A physical examination of M.E. also revealed that she had several contusions on various parts of her body.

---

[5] A subdural hematoma is a large pocket of blood situated between the inner part of the skull and the brain tissue.

6

During the afternoon of December 3, 2008, South Bend Police Detective Brian Young ("Detective Young") interviewed Escobedo at the South Bend Police Department. During the interview, Escobedo was accompanied by his attorney.[6] Escobedo told Detective Young that he and Kristina were in the living room when they heard M.E. vomit. Escobedo said that he went into M.E.'s room and found M.E. lying on her back, with her eyes half open, and covered in vomit. Escobedo told the detective that he changed M.E.'s diaper, wrapped her in a blanket, and took her to the living room. Escobedo stated that when he and Kristina noticed that M.E. had some swelling on her head and saw that she was unresponsive, they took her to the emergency room. Escobedo claimed that M.E. was fine when she went to bed, and he denied doing anything to M.E. that would have caused her head injury.

That same day, at 5:29 p.m., M.E. was pronounced brain dead. Thereafter, doctors took M.E. into surgery so that they could harvest some of her organs for transplantation purposes. Doctors were able to take and use M.E.'s heart and kidneys but they did not take her liver because it had scar tissue or fibrosis and the presence of hemosiderin, which indicated that bleeding had previously occurred in that area of the liver. The pathologist, Dr. Joseph Prahlow ("Dr. Prahlow"), opined that the scarring or fibrosis on M.E.'s liver was from a previous injury that would have been traumatic in nature or caused by a blunt force impact. The autopsy of M.E. indicated that she also had some scarring or fibrosis in her pancreas; bruising to her brain; perioptic nerve and retinal

---

[6] At that time, Escobedo was represented by attorney Rudy Monterrosa. While Escobedo spoke English during the interview, police also had a Spanish speaking police officer in the room to act as a translator when Escobedo needed assistance.

hemorrhaging; and healing fractures in four of her ribs and her left humerus. The autopsy also indicated that M.E.'s cause of death was a craniocerebral trauma and that the manner of death was homicide.

On December 8, 2008, the State charged Escobedo with Count 1, Class A felony battery and Count 2, Class B felony neglect of a dependent. When the State charged Escobedo with neglect of a dependent, it limited the allegations of neglect to injuries sustained by M.E. in 2008. Later, in January 2010, the State added a third count and charged Escobedo with murder, a felony.

On October 13, 2011, the trial court held a pretrial hearing to discuss evidentiary issues prior to the upcoming October 24th jury trial. In relevant part, the parties discussed issues relating to the admissibility of evidence regarding injuries that M.E. suffered in 2007—including a left clavicle fracture, a left elbow fracture, and a rib fracture—which led to DCS's removal of M.E. from the home. In an effort to introduce evidence of these 2007 injuries, the State verbally moved to amend the charging information on the neglect of a dependent charge to include the beginning date of 2007, instead of 2008 as listed on the information.[7] Escobedo objected to the amendment based on prejudice to Escobedo to have to defend against these 2007 injuries. The trial court denied the State's motion to amend the charging information.

The trial court, however, discussed the possibility that evidence of the 2007 injuries could nevertheless be admissible on cross examination of Escobedo's medical

---

[7] In the course of discussing whether the State would be allowed to amend the neglect of a dependent charge, the prosecutor made a reference to other evidence that would be presented at trial to support the neglect of a dependent charge, including Dr. Prahlow's findings regarding M.E.'s injuries to her liver and pancreas.

witnesses if they opened the door to such evidence with their testimony. Escobedo's attorney acknowledged that possibility and stated that he planned to call Dr. Ronald Uscinski ("Dr. Uscinski"), who would testify about M.E.'s skull injury and whether or not it was the result of abuse. The State then indicated that it would file a 404(b) notice, and the trial court stated it would address the issue thereafter.

One week prior to trial, on October 17, 2011, the State filed a notice of intent to introduce 404(b) evidence, indicating that it was going to seek to introduce evidence of M.E.'s injuries suffered in 2007 (i.e., left clavicle fracture, left elbow fracture, rib fracture) because Escobedo was planning to introduce the issue of "accident" by calling Dr. Uscinski as a witness. (App. 206). Escobedo filed a response, contending that Dr. Uscinski's testimony would not raise the issue of accident regarding these 2007 injuries.

In the days leading up to trial, Escobedo filed two additional witness lists. He filed the first one on October 18, 2011, and listed Dr. Marvin Miller ("Dr. Miller") as a defense witness. Then, late in the day on October 21, 2011, which was the Friday before the start of the Monday jury trial, Escobedo filed an additional witness list, naming Dr. Peter Stephens ("Dr. Stephens") as a defense witness.

The trial court commenced an eleven-day jury trial on October 24, 2011. On the morning of trial, the prosecutor objected to Escobedo's late disclosure of Dr. Stephens as a witness. The prosecutor indicated that his limited research during the weekend allowed him to discover that Dr. Stephens was a forensic pathologist, and he objected to this late-disclosed witness because he did not know what the content of his testimony would be.

9

Escobedo's trial attorney, Jeffrey Sanford ("Attorney Sanford"),[8] stated that he also did not know what Dr. Stephens's testimony would be because he had not talked to him. Attorney Sanford explained that his law assistant, Michael Edwards ("Attorney Edwards")[9]—who had contacted Dr. Stephens without his knowledge—informed him that Dr. Stephens was going to review the Dr. Prahlow's autopsy results. Attorney Sanford stated that he "really [did not] know if [h]e'd even use Dr. Ste[ph]ens." (A-2 Tr. 67). The trial court stated that it would "wait and see how this thing unfolds" during trial but warned Attorney Sanford that "the longer [the State was] kept in the dark, the less likely Dr. Ste[ph]ens is going to be permitted to testify." (A-2 Tr. 67). Attorney Sanford indicated his understanding of the trial court's warning and again stated that he had no definite plan to call Dr. Stephens as a witness.

Also during the first morning of trial, the trial court addressed the admissibility of evidence that M.E. had suffered a left clavicle fracture, a left elbow fracture, and a rib fracture in 2007 and made a ruling on the State's 404(b) motion. The trial court determined that a general reference to the x-rays and the existence of the prior fractures would be allowed in the State's case-in-chief when Dr. Wilfred Torres-Martinez ("Dr. Torres-Martinez") testified regarding his diagnosis that M.E. did not have osteogenesis imperfecta because the doctor had reviewed and relied on the x-rays as part of his

---

[8] Attorney Sanford also represents Escobedo in this appeal.

[9] At trial, Attorney Sanford referred to Edwards as both a "clerk" and a "law student graduate[.]" (A-2 Tr. 7). On appeal, Attorney Sanford refers to Edwards as "his law intern[.]" (Escobedo's Br. 7-8). One volume of the Transcript refers to Edwards as a "NOTRE DAME LEGAL INTERN[,]" while the remaining Transcript volumes list "ESQ." after Edwards's name. For simplicity, we will refer to him as Attorney Edwards.

diagnosis.[10]  The trial court determined that Dr. Torres-Martinez could discuss his diagnosis without specific reference as to the date of the examination or how the injuries were received.

When making a ruling on the State's 404(b) motion, the trial court referenced the three-part test set forth in *Camm v. State*, 908 N.E.2d 215 (Ind. 2009), *reh'g denied*.  The trial court determined that evidence of the clavicle and rib injuries from 2007 were not admissible under Evidence Rule 404(b) because that the State had not provided sufficient evidence linking Escobedo to those injuries.  The trial court, however, determined that evidence of M.E.'s elbow injury from 2007 would be admissible on the battery and murder charges because the State had met its burden of showing that Escobedo was linked to the elbow injury.  The trial court ruled that the State could present evidence of this elbow injury only if Escobedo opened the door to such testimony.

During the second day of trial, Escobedo's attorney indicated that he wanted to call Dr. Stephens as a witness, apparently indicating that he would be called to address the nature of the injuries to M.E.'s liver and pancreas.  The trial court instructed Escobedo's attorney to provide Dr. Stephens's curriculum vitae and to arrange for the prosecutor to talk to Dr. Stephens that night.

The following day, prior to reconvening the jury, the prosecutor informed the trial court that he had spoken with Dr. Stephens.  The prosecutor stated that Dr. Stephens told him that, if allowed to testify, he would testify that:  (1) the injuries to M.E.'s liver and pancreas were the result of some sort of natural disease and not the result of blunt force

---

[10] In 2007, after it was discovered that M.E. had had a clavicle, elbow, and rib fracture, Dr. Torres-Martinez examined and tested M.E. to see if she had any sort of bone deficiency.

trauma, which would be contrary to Dr. Prahlow's proposed testimony; (2) the four rib fractures—that were examined by Dr. Prahlow and found to be recent fractures with some degree of healing—were not fractures but were consistent with some type of metabolic bone disease; (3) Dr. Prahlow's interpretation of the autopsy slides and the validity of the other x-rays determining that M.E. had other fractures should be questioned as to whether the injuries were actually the result of a metabolic bone disease and that further testing should have been done regarding the bone disease; and (4) a short fall could have caused her skull fracture, brain swelling, subdural hemorrhaging, other body fractures, and facial abrasions. The prosecutor also stated that Dr. Stephens indicated that he could have conducted further testing of the autopsy slides for bone disease and that such testing would yield results in three months.

Escobedo's attorney, Attorney Sanford, claimed that he had only recently become aware of the potential significance of evidence relating to damage to M.E.'s liver and pancreas after the October 13th pretrial hearing. Attorney Sanford indicated that he had thereafter been made aware of Dr. Stephens as a potential witness on the Thursday before trial—which was October 20—by Attorney Edwards, who had contacted Dr. Stephens the previous day.

The prosecutor, objecting to Dr. Stephens as a late-disclosed witness, argued that the defense had copies of Dr. Prahlow's slides and his testimony from Kristina's trial since at least the Summer of 2010. The prosecutor asserted that Dr. Stephens's testimony would amount to an attack on every medical opinion that would be presented and that the State, in the midst of trial, did not have time to thoroughly research Dr. Stephens to

prepare for cross-examination or to find additional expert witnesses to confirm the findings of the State's medical witnesses.

When determining whether to exclude Dr. Stephens as a witness, the trial court reviewed the Indiana Supreme Court's opinion in *Vasquez v. State*, 868 N.E.2d 473 (Ind. 2007), which set forth the factors helpful in making a determination of whether to exclude a witness. The trial court ruled that it would allow Escobedo to present Dr. Stephens as a witness but that it would limit the scope of his testimony to the areas of which Escobedo's attorney claimed he had only recently become aware of the significance. Specifically, the trial court ruled, in relevant part:

> But in balancing all of this out, I think that the most appropriate resolution is to allow Dr. Stephens to testify as to the liver and pancreas. That limits the scope of his testimony. That addresses the testimony of which the defendant was unaware, or the issue of which the defendant was unaware until relatively recently. So it enables the defendant to explore that topic which it felt at a disadvantage in understanding until very recently and allows the [S]tate a fairly limited topic upon which to try to obtain further medical information or expert testimony.

> \* \* \* \* \*

> I know you did not have the time that I had last night to research the issue of exclusion of witnesses. I can only tell you . . . I have thought about this a great deal. I have, as you both know, been a trial lawyer. I have tried cases where . . . the emotional content of the trial is such that it weighs very heavily on the attorneys and I think makes it even more difficult to do what I am asking you to do. I understand all of those things, and I tried to balance everything. The prejudice to the defendant against the strong preference of the Indiana Supreme Court toward the admission of late noticed witnesses['] testimony. They view it from the perspective that it is the defendant's liberty at stake and that there should be a full erring of the evidence.

> So in trying to balance all of this out, I arrived at this decision. That based on [Escobedo's attorney's] representation and the misunderstanding

13

regarding the significance of the liver and pancreas versus the availability of all the other information. For a very long time I would note that Kristina Byers-Escobedo was sentenced on February 26th of 2010, which means within short order thereafter a transcript of all of the medical testimony was available against the need of course of Mr. Escobedo to have the opportunity to vigorously defend himself.

(Vol. II Tr. 23-25). The trial court noted that a continuance was not a likelihood given the commencement of the trial and Escobedo's counsel's assertion on the first day of trial that Dr. Stephens would likely not even be called as a witness. The trial court told the prosecutor that it would try to work with the trial schedule to allow him the ability obtain further medical information or expert testimony on the liver and pancreas issue in response to the trial court's ruling allowing Dr. Stephens to testify.

Thereafter, Escobedo's attorney made an offer to prove regarding Dr. Stephens's excluded testimony.[11] Dr. Stephens then testified and disagreed with the Dr. Prahlow's opinion that the fibrosis found on M.E.'s liver and pancreas was the result of blunt force trauma. Dr. Stephens testified that the fibrosis could have been caused by some sort of disease that could have been ruled out with further testing of the liver and pancreas.

On the sixth day of the jury trial, Escobedo testified. During his direct examination,[12] Escobedo testified regarding his version of how M.E. sustained her skull fracture. Escobedo testified that he found M.E. in her bed with vomit on her and asked her if her "belly" hurt, to which she "shook her head yes." (Vol. V Tr. 30). Escobedo

---

[11] In Escobedo's offer to prove, he presented testimony from Dr. Stephens, who suggested that M.E. had a bone abnormality (either a bone dyplasia or metabolic bone disease). Dr. Stephens acknowledged that M.E. was tested for, and found not to have, osteogenesis imperfect; however, he opined that other bone dysplasias should have been ruled out. Dr. Stephens also stated that he did not know whether or not a bone dysplasia or metabolic bone disorder would affect M.E.'s susceptibility to injury or a skull fracture.

[12] Escobedo's direct examination was conducted by Attorney Edwards.

14

testified that he then undressed M.E., had her take her diaper to the trash, and then got into the shower with her. He further testified that M.E. started to fall, he tried to reach for her, and then he fell on top of her. Escobedo testified that he tried to talk to M.E. but that she was not responsive. He testified that he got dressed, wrapped M.E. in a towel and a blanket, took her to the sofa, and called Kristina, who was in the driveway. Escobedo then testified that when Kristina asked him how M.E. had gotten the lump on her head, he did not tell Kristina about falling in the shower with M.E. but instead told her that he "found her like that." (Vol. V Tr. 33). Escobedo stated that he lied to his wife because he knew they were going to the hospital, and he wanted Kristina to say that she was with him and he "didn't want people to think [he] was doing something wrong with [his] daughter." (Vol. V Tr. 33).

Escobedo also admitted that he and Kristina lied to staff at the hospital by telling them that they found M.E. unconscious. When Escobedo's attorney asked him why he did not tell the truth at the hospital, he replied that he was "scared" because "they already did me wrong once" when "[t]hey took my daughter [sic] away from me before." (Vol. V Tr. 36). Escobedo then testified regarding how DCS had removed M.E. from the home in 2007 after they took her to the hospital for a respiratory problem. Escobedo then testified in detail about injuries M.E. had sustained in 2007—including injuries to her elbow, clavicle, and rib—and about his interactions with DCS. When testifying about M.E.'s 2007 elbow injury, his testimony suggested that her elbow was injured by the doctor who manipulated it and placed it in a sling. Escobedo also talked about a second time that M.E. had been removed by DCS. Escobedo stated that DCS accused them of

15

abusing M.E. and that he denied it. Escobedo's attorney asked, "Was abuse ever substantiated?", and Escobedo replied, "No." (Vol. V Tr. 52).

Following Escobedo's testimony, the State argued that Escobedo had opened the door to evidence regarding M.E.'s 2007 injuries with his testimony that he was "done wrong" and his testimony that DCS had not substantiated abuse. Thus, the State requested to present testimony to rebut Escobedo's testimony that DCS had wrongfully removed M.E. Escobedo's attorney argued that evidence of the 2007 injuries was not admissible under Rule 404(b) and the *Camm* test because, as had been discussed before trial, there was not sufficient evidence connecting Escobedo to the injuries.

The trial court granted the State's request for limited rebuttal testimony, clarifying that the testimony was being allowed in response to Escobedo's direct examination testimony and for the limited purpose of rebutting Escobedo's testimony that M.E. had been wrongfully removed. The trial court stated that the rebuttal testimony was not for a Rule 404(b) purpose of rebutting Escobedo's testimony that he did not abuse M.E. and not for trying to prove that Escobedo had committed the injuries. Escobedo's attorney stated that he understood but requested the trial court to give a limiting instruction. The trial court granted the request, and the trial judge worked with Escobedo's attorney on the wording for the limiting instruction.

Thereafter, the State presented rebuttal testimony from an orthopedic doctor and a DCS worker. Dr. Clemency testified about M.E. having a fractured elbow, clavicle, and rib in January 2007 and testified that these injuries to five-month-old M.E. led him to

16

contact DCS. The DCS worker testified that DCS detained M.E. because of information received from medical doctors and that DCS did substantiate abuse.

The trial court gave the jury the following limiting instruction both after Dr. Clemency's testimony and the DCS worker's testimony: "You have heard testimony . . . regarding the circumstances surround the removal of [M.E.] from her parents' care in January of 2007. You may or may not consider this evidence only for the purpose of evaluating the defendant's testimony regarding the reasons for her removal." (Vol. VII Tr. 82). The trial court also read the limiting instruction as part of its final instructions to the jury.

During the jury trial, multiple doctors opined that M.E.'s skull fracture was caused by some sort of blunt force trauma that was non-accidental. The doctors also opined that the nature and extent of M.E.'s injuries were suggestive of child abuse and that a significant amount of force would be necessary to sustain a skull fracture such as M.E. had. For example, Dr. Dejong opined that the amount of force necessary to cause such a skull fracture could include things such as being thrown against a wall, being hit with a blunt object, or being in an auto accident.

The jury found Escobedo guilty of Class A felony battery and Class B felony neglect of a dependent and not guilty of murder. The trial court entered judgment of conviction on the battery conviction as charged and entered judgment of conviction on the neglect of a dependent as a Class D felony.

At the sentencing hearing, the trial court found Escobedo's lack of criminal history to be a mitigating factor. The trial court, however, determined, that his lack of criminal

17

history was balanced out by the aggravating factor that he was an illegal alien and had been in this country illegally since the age of seventeen. Citing *Sanchez v. State*, 891 N.E.2d 174 (Ind. Ct. App. 2008), the trial court found that Escobedo's "disregard of the immigration law" to be an aggravating factor and acknowledged that it could not sentence Escobedo more harshly because of his illegal alien status. (Vol. X Tr. 160). The trial court determined that Escobedo's illegal status aggravator "balance[d] out" his lack of criminal history mitigator. (Vol. X Tr. 160). The trial court also found the following additional aggravating circumstances: (1) M.E.'s young age and vulnerability; (2) Escobedo's violation of his position of trust with M.E.; and (3) the nature and circumstances of the offenses, including the extensive final injuries suffered by M.E. and the amount of force necessary to sustain those injuries. The trial court imposed a fifty (50) year sentence for Escobedo's Class A felony battery conviction and a three (3) sentence for his Class D felony neglect of a dependent conviction. The trial court ordered that the sentences be served consecutively and executed at the Department of Correction. Escobedo now appeals his convictions and sentence. Additional facts will be provided as necessary.

DECISION

1. <u>Evidentiary Rulings</u>

Escobedo contends that the trial court abused its discretion by (a) excluding testimony from Dr. Stephens; and (b) admitting rebuttal evidence from the State.

The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for abuse of discretion. *Wilson*

18

*v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Conley v. State*, 972 N.E.2d 864, 871 (Ind. 2012), *reh'g denied*.

A. *Exclusion of Evidence*

Escobedo first argues that the trial court abused its discretion by excluding Dr. Stephen's testimony regarding his opinion that M.E. suffered from some sort of metabolic bone disease.

"Trial courts have the discretion to exclude a belatedly disclosed witness when there is evidence of bad faith on the part of counsel or a showing of substantial prejudice to the State." *Williams v. State*, 714 N.E.2d 644, 651 (Ind. 1999), *cert. denied*. Our Indiana Supreme Court has provided factors that are helpful in determining whether to exclude witness testimony: (1) the point in time when the parties first knew of the witness; (2) the importance of the witness's testimony; (3) the prejudice resulting to the opposing party; (4) the appropriateness of instead granting a continuance or some other remedy; and (5) whether the opposing party would be unduly surprised and prejudiced by the inclusion of the witness's testimony. *Vasquez v. State*, 868 N.E.2d 473, 476 (Ind. 2007) (citing *Williams*, 714 N.E.2d at 651 n.5; *Cook v. State*, 675 N.E.2d 687, 691 n.3 (Ind. 1996)). "Indiana jurisprudence recognizes a strong presumption to allow defense testimony, even of late-disclosed witnesses: 'The most extreme sanction of witness exclusion should not be employed unless the defendant's breach has been purposeful or intentional or unless substantial and irreparable prejudice would result to the State.'" *Vasquez*, 868 N.E.2d at 476 (quoting *Wiseheart v. State*, 491 N.E.2d 985, 991 (Ind.

19

1986)). When making a decision to exclude a witness, a trial court "must give substantial weight" to a defendant's constitutional right to present witnesses on his behalf. *Vasquez*, 868 N.E.2d at 476. However, "depending on the circumstances, excluding a witness may be appropriate or it may be unconstitutional." *Id.* (citing *Taylor v. Illinois*, 484 U.S. 400 (1988)).

Escobedo contends that the trial court erred by excluding his late-disclosed witness's testimony, asserting that there is no evidence that Escobedo's counsel acted in bad faith and that the testimony would not have prejudiced the State.

We first clarify that the trial court did not exclude Dr. Stephens as a witness. Despite the late notification of Dr. Stephens as a witness, the trial court allowed Dr. Stephens to testify. The trial court merely limited his testimony to the subject area of the injuries to M.E.'s liver and pancreas based on Escobedo's attorney's assertion that the defense had only become aware of the significance of the injuries a week before trial.

Additionally, the trial court's ruling was not made based on a finding that Escobedo or his attorney had engaged in bad faith. Indeed, the trial court indicated that Escobedo's counsel had not "attempt[ed] to sand bag" or had not acted in bad faith. (Vol. II Tr. 19). Instead, the trial court struck a balance between the prejudice to the State and the importance of allowing Escobedo to present evidence by allowing Dr. Stephens to testify while limiting the subject area of his testimony.

The State contends that "[t]he trial court engaged in a thorough and thoughtful balancing of the parties' interests and did not abuse its discretion in permitting only limited testimony from Dr. Stephens." (State's Br. 11). We agree.

20

The trial court made a thorough and extremely clear record regarding its decision to limit Dr. Stephens's testimony and recapped the proceedings and reasons for its ruling as follows:

> What I'm searching for are the cases that I discussed earlier in the context of the witness. I wanted to make sure that I hit those five points that were outlined. In *Vasquez* and made clear the determination - - the reasons for the determination. The five factors the court indicated were helpful in determining whether to exclude a witness were these: when the parties first knew of the witness. It seems to me, both sides.
>
> Mr. Sanford [Escobedo's attorney] learned of the witness on Thursday, filed a witness list on Friday, which the [S]tate received at 3:30. In those last two days that preceded the beginning of this trial on Monday, two expert witnesses['] names were filed: Doctor Marvin Miller, first, and then Dr. Peter Stephens. The defense counsel indicated on Monday what the record reflects, which the Court took to indicate that Dr. Stephens was not a likely witness. The importance of the witness's testimony that has been described by defense counsel relates to the alternate explanations for the injuries received by the child. It was also described by Mr. Cotter [the prosecutor] to include, not only the injuries to the organs of the pancreas and liver, but also the possibility of metabolic reasons for the bone breaks and the status of the rib fractures found by Dr. Prahlow and Dr. Stephens. Also, the [S]tate learned yesterday, the Court learned this morning, it would include short falls and the possibility of the injuries to [M.E.] being sustained by short fall. So they're significant for the defense. The prejudice resulting to the opposing party, as [the prosecutor] indicated, who's in the midst of trial. The nature of the testimony that the defense seeks to elicit is medical. It is technical. It is, these topics are topics about which the medical community is in disagreement. The doctor's potential opinion that the cause of the bone breaks was the result of a metabolic disease is something that the [S]tate is at least unable to refute by testing, having been unaware of this claim. The appropriateness of lesser remedies such as continuances, given just the status of the filing, the time of the filing of the notice of the witness and the conversations that this Court held on Monday with counsel make [a] continuance unavailable as a remedy, in terms at least of continuing the entire trial. The trial was about to begin. It appeared that it was unlikely Dr. Stephens would be called, and I find no fault with the [S]tate to not having asked for a continuance, at that time. I will further note that, as to Dr. Miller, the [S]tate did not request a continuance or any accommodation, had Dr. Miller been called.

21

And the fourth was whether the opposing party would be unduly surprised and prejudiced by the inclusion of the witness's testimony. The [S]tate had indicated the ways in which it would be prejudiced by that inclusions. The Court has attempted to balance that prejudice, which the Court finds to be substantial, against the defendant's right to fully and completely present a defense. I find that, as to certainly the short fall issue, that Dr. Uscinski, who is the other expert witness who the defendant plans to call, I assume that he would be capable, as a neurologist, of addressing the issue of brain injury in short falls.

I also further find that when the defense indicated they would - - Maybe not find. I note that when the defense indicated that it would like to call Dr. Stephens it couched its explanation for the lateness of the proffer's name couched in the context of the organ injuries of which the defendant was unaware of the - - significance of which the defendant was unaware. In arriving at its determinations as to what to allow and what not to allow, the Court took that into consideration and tried to balance that against the fact that this case has been pending for three years, that for almost a year and a half the transcripts of the prior trial of Kristina Byers-Escobedo were available, and that the issue of how the bones might have broken, both in terms of the mechanism of injury, as well as whether there was any other - - I think this is the right word - - was not unknown. And if the Court were to allow all of these topics to be covered by Dr. Stephens, I believe that the [S]tate would be unduly prejudiced because of the various topics about which Dr. Stephens has an opinion, and so that is why the Court has ruled that the information regarding the organs may be inquired into, and Dr. Stephens may testify as to that, but the other topics about which Dr. Stephens has an opinion are not to be inquired into by the defendant. Somehow the [S]tate might, though I doubt it, open the door to some of these other topics in its inquiry with Dr. Stephens. But absent that, those topics are not to be covered by the defendant.

(Vol. II Tr. 77-80) (italics to case name added).

Given the factors in *Vasquez* and our review of the record before us and the specific facts of this case, we conclude that the trial court did not abuse its discretion by allowing Dr. Stephens to testify while limiting his testimony. Here, the trial court weighed the nature of Dr. Stephens's proposed testimony—which was medical and

22

technical in nature and included topics about which the medical community was in disagreement—with the timing of the filing of the notice—which did not allow the State sufficient time to refute that medical testimony by conducting additional medical testing or by obtaining additional experts to testify—along with the fact that any issue regarding M.E.'s bones had been known and available for a minimum of one and one-half years since Kristina's trial.

We recognize the "strong presumption to allow defense testimony, even of late-disclosed witnesses." *Vasquez*, 868 N.E.2d at 476. From the record before us, it is clear that the trial court also recognized that presumption and was mindful of Escobedo's right to present evidence while, at the same time, it tried to accommodate any prejudice to the State by Escobedo's late-disclosed witness. Given the specific circumstances in this case, we conclude that the trial court did not err when it allowed Dr. Stephens to testify on a limited basis. Accordingly, we affirm the trial court's evidentiary ruling.

B. *Admission of Evidence*

Next, Escobedo asserts that the trial court abused its discretion by allowing the State to present rebuttal evidence. Specifically, Escobedo contends that the admission of testimony from Dr. Clemency and the DCS worker regarding injuries M.E. suffered in 2007 was inadmissible 404(b) evidence. Escobedo argues that the State's rebuttal testimony was erroneously admitted because there was not sufficient evidence that he

was the perpetrator of the prior bad acts and because the trial court did not balance the probative value of the evidence against its prejudicial value under Evidence Rule 403.[13]

Indiana Evidence Rule 404(b) provides that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Evidence Rule 404(b) is "designed to prevent the jury from assessing a defendant's present guilt on the basis of his past propensities." *Hicks v. State*, 690 N.E.2d 215, 218 (Ind. 1997). In determining whether to admit evidence of specific acts under the rule, the trial court is to: (1) determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; (2) determine that the proponent has sufficient proof that the person who allegedly committed the act did, in fact, commit the act; and (3) balance the probative value of the evidence against its prejudicial effect pursuant to Indiana Evidence Rule 403. *Camm v. State*, 908 N.E.2d 215, 223 (Ind. 2009), *reh'g denied*.

Nevertheless, evidence that is otherwise inadmissible under Rule 404(b) may become admissible "where the defendant 'opens the door' to questioning on that evidence." *Jackson v. State*, 728 N.E.2d 147, 152 (Ind. 2000). "'[T]he evidence relied

---

[13] To the extent Escobedo is raising a claim of error under Rule 403 separate from the analysis of Rule 404(b), we find that he has waived such argument because he did not raise a specific objection to the State's rebuttal evidence based on Evidence Rule 403. "Grounds for objection must be specific and any grounds not raised in the trial court are not available on appeal." *Grace v. State*, 731 N.E.2d 442, 444 (Ind. 2000), *reh'g denied*. Thus, Escobedo's argument regarding Evidence Rule 403 is not available on appeal.

24

upon to 'open the door' must leave the trier of fact with a false or misleading impression of the facts related.'" *Id.* (quoting *Gilliam v. State*, 383 N.E.2d 297, 301 (Ind. 1978)).

Prior to trial, the trial court ruled that evidence regarding M.E.'s injuries sustained in 2007 would not be admissible under Rule 404(b) and the test set forth in *Camm*. However, at trial, Escobedo testified during direct examination that he lied to hospital staff about M.E.'s injuries because "they already did me wrong once" when "[t]hey took my daughter [sic] away from me before." (Vol. V Tr. 36). Escobedo then testified in detail about injuries M.E. had sustained in 2007—including injuries to her elbow, clavicle, and rib—and about how DCS had removed M.E. from their home on two occasions. Escobedo also testified that DCS had not substantiated abuse.

The State argued that Escobedo had opened the door to evidence regarding M.E.'s 2007 injuries, and Escobedo's attorney argued that evidence of the 2007 injuries was not admissible under Rule 404(b) and the *Camm* test because, as had been discussed before trial, there was not sufficient evidence connecting Escobedo to the injuries. The trial court granted the State's request to present rebuttal testimony. In doing so, the trial court specifically clarified that the rebuttal testimony was being allowed in response to Escobedo's direct examination testimony and for the limited purpose of rebutting Escobedo's testimony that M.E. had been wrongfully removed. The trial court explained that the testimony was not being offered as Rule 404(b) evidence or for the purpose of trying to prove that Escobedo had committed the injuries.

Thereafter, the State presented rebuttal testimony from Dr. Clemency and a DCS worker. Dr. Clemency testified about M.E. having a fractured elbow, clavicle, and rib in

25

January 2007 and testified that these injuries to five-month-old M.E. led him to contact DCS. The DCS worker testified that DCS detained M.E. because of information received from medical doctors and that DCS did substantiate abuse. After each witness, the trial court gave the following limiting instruction: "You have heard testimony . . . regarding the circumstances surrounding the removal of [M.E.] from her parents' care in January of 2007. You may or may not consider this evidence only for the purpose of evaluating the defendant's testimony regarding the reasons for her removal." (Vol. VII Tr. 82).

Here, Escobedo's testimony that he was "done wrong" left the jury with a false impression that M.E. was wrongfully removed from his home by DCS. Thus, his testimony opened the door to the State's introduction of evidence to rebut this false impression. Indeed, Escobedo admits that he "opened the door" when he testified "that he had been done wrong before by the removal of his daughter from his home[.]" (Escobedo's Br. 17). Because Escobedo opened the door with his testimony, Evidence Rule 404(b) did not bar admission of evidence of relating to M.E.'s injuries in 2007 that led to her removal by DCS. *See Jackson*, 728 N.E.2d at 152 (explaining that evidence otherwise inadmissible under Rule 404(b) may become admissible where the defendant opens the door to questioning on that evidence). Accordingly, the trial court did not abuse its discretion by allowing the State to present the rebuttal evidence. *See, e.g.*, id. (holding that that trial court, which had granted a motion in limine excluding evidence of defendant's prior battery of the victim, did not err in allowing State to present evidence of the prior battery where defendant opened the door to such testimony).

26

2. Appropriateness of Sentence

Lastly, Escobedo argues that his aggregate sentence of fifty-three (53) years was inappropriate.

We may revise a sentence if it is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). The defendant has the burden of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). The principal role of a Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Whether a sentence is inappropriate ultimately turns on "the culpability of the defendant, the *severity of the crime*, the damage done to others, and a myriad of other factors that come to light in a given case." *Id.* at 1224 (emphasis added). Our sentence review under Appellate Rule 7(B) "is not to determine whether another sentence is more appropriate but rather whether the sentence imposed is inappropriate." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012) (internal quotation marks and citation omitted), *reh'g denied*. "It is not a matter of second guessing the trial court sentence." *Id.*

In determining whether a sentence is inappropriate, we acknowledge that the advisory sentence "is the starting point the Legislature has selected as an appropriate sentence for the crime committed." *Childress*, 848 N.E.2d at 1081. Escobedo was convicted of battery as a Class A felony and neglect of a dependent, which the trial court entered as a Class D felony. The sentencing range for a Class A felony is between twenty

27

(20) and fifty (50) years, with the advisory sentence being thirty (30) years. I.C. § 35-50-2-4. The sentencing range for a Class D felony is between six (6) months and three (3) years, with the advisory sentence being one and one-half (1½) years. I.C. § 35-50-2-7. Here, the trial court sentenced Escobedo to the maximum term for each of his convictions and imposed an aggregate fifty-three (53) year sentence executed in the Department of Correction.

Regarding the nature Escobedo's battery offense, the record reveals that on December 2, 2008, M.E. watched TV and appeared to be an otherwise normal two-year-old when her mother left the house that night. However, during the time M.E.'s mother was gone from the house and Escobedo was left alone with the two children, M.E. sustained facial abrasions, as well as, a fourteen-centimeter skull fracture and a subdural hematoma that ultimately led to her death. During the trial, doctors testified that the nature and extent of M.E.'s injuries were suggestive of child abuse and that a significant amount of force would be necessary to sustain a skull fracture such as M.E. had. Indeed, one doctor opined that the amount of force necessary to cause such a skull fracture could include things such as being thrown against a wall, being hit with a blunt object, or being in an auto accident. M.E. had to endure surgery, during which the neurosurgeon removed part of her skull to accommodate the extensive swelling to her brain.

The trial court, when discussing aggravating factors, summarized the nature of the battery offense as follows:

> Specifically, I considered [M.E.'s] injuries and what those injuries tell us about what happened to [M.E.]. I once read a book, and I wish I could quote this better, but it was more than a decade ago, and it was about

28

abus[ed] children, and I think it was some pathologist who wrote that the sad irony of child abuse is that all too often a child who can not speak in life, in death their body is able to tell us what they couldn't tell in life, and [M.E.'s] body certainly did that. She had that 14-centimeter fracture, and that fracture is significant in reflecting upon the force with which she was struck, as well as were the rotational injuries and the bruising to the brain and the contusions to the brain. The scalp contusion on the right side and the back of her face, the abrasions on her chin, all told those doctors who were asked about it that that was not just one strike that she suffered on the night of December 2nd, but that there had to be, and I think Dr[s]. Oranu and Prahlow said this, three planes of injuries. She had the front, the side and the back. And then of course there were the assorted bruises, although none of them were extraordinarily large, about her body. So [Drs.] Prahlow and Oranu said three planes. Dr. Yount, as you'll recall, said she was brutalized.

(Vol. X Tr. 161-62).

Additionally, as to the nature of the neglect of a dependent offense, the record reveals that M.E. suffered numerous injuries during her young lifetime while in Escobedo's care. For example, in June 2008, M.E. sustained an elbow injury while he was watching her, but Escobedo and his wife did not seek immediate medical treatment for M.E. Instead, they waited a couple of days and drove M.E. to a hospital three hours from their house. Also, in the Fall of 2008, M.E. injured her leg while in Escobedo's care. The injury caused M.E. to walk with a limp and to favor one leg, but Escobedo and Kristina did not seek medical treatment for M.E.'s injured leg. Tests conducted on M.E. after her skull surgery revealed that she had multiple old rib fractures, old fractures of the distal portion of both humerus bones, as well as an old fracture of her left tibia.

As to Escobedo's character, the record reveals that Escobedo did not have a criminal history. However, as the trial court discussed, Escobedo—who was twenty-four years old at the time of his offense—had entered the United States illegally when he was

29

seventeen years old and apparently had not done anything to change his status as an illegal alien. The trial court, citing to *Sanchez,* found that Escobedo's disregard of the immigration law to be an aggravating factor; acknowledged that it could not sentence Escobedo more harshly because of his illegal alien status; and determined that Escobedo's illegal status aggravator "balance[d] out" his lack of criminal history mitigator. (Vol. X Tr. 160).

Escobedo acknowledges that "[t]he trial court properly used Sanchez to justify considering [Escobedo's] illegal status as an aggravator." (Escobedo's Br. 20). However, Escobedo contends that the trial court erred by using that aggravator to balance out his lack of criminal history mitigator, which he suggests was significant and should have entitled him to some leniency. In essence, Escobedo's argument is nothing more than a challenge to the weight the trial court gave to his criminal history mitigator, which is not reviewable on appeal. *See Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007) (explaining that the relative weight assigned to aggravators and mitigators is not subject to appellate review), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007).

Escobedo's character is also reflected by the lies he told when discussing how M.E. was injured on the night she died. Escobedo lied to his wife, to the police, and to the doctors who were trying to save her. As the trial court noted during sentencing, Escobedo's "series of lies" during the last days of M.E.'s life "reflect[ed] very poorly on [his] character." (Vol. X Tr. 160). Additionally, as the trial court noted, Escobedo abused a position of trust with M.E. when he committed these crimes against her, which also is a negative reflection on his character.

Escobedo suggests that his sentence was inappropriate because he received the maximum sentence, which he contends is for the worst offenders. He asserts that because he did not have a criminal history, he was not the "worst of the worst" and was "not an appropriate candidate for the statutory maximum sentence." (Escobedo's Br. 22). Escobedo's argument, which focuses on one aspect of his character, ignores the aggravators found by the trial court, which included (1) M.E.'s young age and vulnerability; (2) Escobedo's violation of his position of trust with M.E.; and (3) the nature and circumstances of the offenses, including the extensive final injuries suffered by M.E. and the amount of force necessary to sustain those injuries.

The trial court recognized that Escobedo did not have a criminal history but determined that the particularly heinous nature of the crime against Escobedo's own young child called for maximum sentences. The trial court acknowledged that the maximum sentence is reserved for the worst of the worst offenders and discussed its rationale of imposing maximum sentences during sentencing.

> To begin with, what is the worst of the worst when you're talking about the death of a child? That's a hard analysis. So I looked at her death. I've talked about that. The brutality involved in that final injury but, also, the rest of it. [M.E.] did not go gentle into that good night. She had to undergo that surgery, and in that surgery they took away a part of her scalp or skull, laid it aside, wrapped her head in the hope that the reduction in pressure resulting from the skull removal would somehow relieve the pressure enough that she would survive. Which i[t] didn't. But she went through that because of you, because of the injury you inflicted upon your daughter. And so when I'm talking about the offense and the nature of the injury, I find that that to be among the worst of the worst.
>
> And then I'm also supposed to look at the offender, the worst of the worst offender, and often when I'm doing that when I'm sentencing what I'm looking at is a criminal record, and you have none, but what is the

31

worst of the worst offender when we're talking about a little girl killed, and the killer, the person responsible for her death, is her father? The person that . . . that's most supposed to help her and protect her and care for her. That you're the one that inflicted those blows, I think, makes under these circumstances you among the worst of the worst offenders, and I didn't know exactly how to categorize this, but I thought about the age . . . [t]he age of the victim. Not just in terms of her vulnerability that I talked about earlier, but in the context of the worst of the worst, you know, and a child's death at two.

I have a niece that's seven, and I thought about well, what has [she] done by seven that [M.E.] never got the opportunity to do because of how young she was? [M.E.] never got the opportunity to sing in a Christmas recital. [M.E.] never got the opportunity to kick a soccer ball or dance ballet, and I think that makes this among the worst of the worst . . .

(Vol. X Tr. 163-64).

Escobedo has not persuaded us that his sentence is inappropriate. Given the nature of Escobedo's offenses, his character, and the aggravators found by the trial court, the imposition of maximum sentences was justified as form of retribution in this specific case.[14] In other words, the maximum sentence here can be justified as a deontological response giving voice to a community's outrage, based on the facts and circumstances of the crime. Accordingly, we affirm the trial court's sentence. *See, e.g.*, *Sanchez*, 891 N.E.2d at 176 (holding that—despite defendant's lack of criminal history—his 40-year maximum sentence under his plea agreement was not inappropriate in light of the nature of the offense and defendant's character, which included the aggravator that he was an illegal alien).

---

[14] We recognize that "under our state constitution the primary aim of punishment is rehabilitation, not retribution or deterrence." *Gonzalez v. State*, 980 N.E.2d 312, 318 n.5 (Ind. 2013) (citing Ind. Const. art. 1, § 18) ("The penal code shall be founded on principles of reformation, and not vindictive justice."). *But see Wallace v. State*, 905 N.E.2d 371, 379 (Ind. 2009) (noting that "the traditional aims of punishment" include "retribution and deterrence") (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963)), *reh'g denied*.

Affirmed.

ROBB, C.J., and MAY, J., concur.